UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL TENORE, | No.  2: 17-cv-1802 KJM KJN P |
| Plaintiff, | |
| v. | ORDER AND FINDINGS AND RECOMMENDATIONS |
| E. HOROWTIZ, et al., | |
| Defendants. | |

I.      Introduction

Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant to 42 U.S.C. § 1983.  Pending before the court is defendants' summary judgment motion.  (ECF No. 60.)  For the reasons stated herein, the undersigned recommends that defendants' motion be granted in part and denied in part.

II.     Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil Procedure 56 is met.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings,

1

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c)).  "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d

1    1564, 1575 (9th Cir. 1990).

2        In the endeavor to establish the existence of a factual dispute, the opposing party need not

3    establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

4    dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

5    trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

6    the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

7    Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

8    amendments).

9        In resolving a summary judgment motion, the court examines the pleadings, depositions,

10   answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

11   Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

12   255.  All reasonable inferences that may be drawn from the facts placed before the court must be

13   drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587; Walls v. Central Costa

14   County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011).  Nevertheless, inferences are not

15   drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from

16   which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224,

17   1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a

18   genuine issue, the opposing party "must do more than simply show that there is some

19   metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

20   not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

21   trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

22       By contemporaneous notice provided on January 2, 2018 (ECF No. 15), plaintiff was

23   advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal

24   Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc);

25   Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

26   ////

27   ////

28   ////

3

1    III.    Plaintiff's Claims

2        This action proceeds on plaintiff's October 25, 2017 verified complaint as to defendants

3    Dr. Horowitz and Dr. Smith in which plaintiff alleges the following.[1]  (ECF No. 9.)

4        Defendant Horowitz is a primary care physician at Mule Creek State Prison ("MCSP").

5    (Id. at 2.)  Defendant Smith is the Chief Physician and Surgeon at MCSP.  (Id.)

6        On February 4, 2015, plaintiff received a diagnosis of "indefinite low grade dysplasia.  A

7    follow-up examination is recommended."  (Id. at 7.)  Five months passed without such

8    examination or further testing, and on June 30, 2015, plaintiff was diagnosed with

9    adenocarcinoma.  Such delay by defendants Dr. Horowitz and Dr. Smith, as well as their failure

10   to follow the medical recommendation, allegedly allowed plaintiff's condition to develop into

11   esophageal cancer, which necessitated surgery to remove parts of plaintiff's stomach and

12   esophagus.  Dr. Horowitz and Dr. Smith were aware that plaintiff's brother also had esophageal

13   adenocarcinoma and died of the disorder in 1999 at age 52.  Plaintiff's surgery was delayed

14   another four months, allowing further development of the cancer.  On October 22, 2015, plaintiff

15   had surgery for the removal of his esophagus and parts of his stomach and small intestines.

16   Plaintiff contends that had the cancer been diagnosed or treated earlier, he could have received

17   less invasive medical treatment such as endoscopic resection, or radiofrequency or thermal

18   ablation.  (Id. at 6-16, 18.)

19       Plaintiff also alleges that following the surgery, Dr. Horowitz and Dr. Smith denied

20   plaintiff in-cell feeding and a wedge pillow.  (Id. at 21-22; 22-23.)  In particular, plaintiff alleges

21   that after his surgery, the surgeon ordered him to eat six small meals per day.  Plaintiff alleges

22   that the MCSP dining hall is open briefly twice per day and prisoners are not allowed to bring out

23   any food other than the boxed lunch given to them at breakfast.  As a result of this condition,

24   plaintiff alleges that he is unable to eat six small meals per day.  (Id. at 21-22.)

25       Plaintiff alleges that lying flat causes food to come back into his throat and mouth, which

26

27   _____

[1]  On September 9, 2019, the court granted defendants' first summary judgment motion as to
defendant Dr. Soltanian-Zadeh based on plaintiff's failure to exhaust administrative remedies.
28   (ECF No. 57.)

4

1  can then be taken into the lungs.  (Id. at 22.)  This problem is because the duoderal sphincter at

2  the top of plaintiff's stomach was removed along with his esophagus.  (Id. at 22-23.)  As a result,

3  plaintiff's surgeon ordered a wedge pillow to elevate plaintiff's upper body, head and throat to 30

4  degrees to avoid this problem.  (Id. at 23.)

5        Plaintiff alleges that defendants violated his Eighth Amendment right to adequate medical

6  care.

7        As relief, plaintiff seeks money damages and injunctive relief.  Plaintiff seeks an order for

8  a permanent wedge pillow, cell-feeding as long as necessary, a permanent lower bunk and an

9  order prohibiting defendants from housing him in an air-conditioned cell/dorm.  (Id. at 23-24.)

10        IV.    Legal Standard for Eighth Amendment Claim

11        The Eighth Amendment is violated only when a prison official acts with deliberate

12  indifference to an inmate's serious medical needs.  Snow v. McDaniel, 681 F.3d 978, 985 (9th

13  Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th

14  Cir. 2014); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  To state a claim a plaintiff "must

15  show (1) a serious medical need by demonstrating that failure to treat [his] condition could result

16  in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the

17  defendant's response to the need was deliberately indifferent."  Wilhelm v. Rotman, 680 F.3d

18  1113, 1122 (9th Cir. 2012) (citing Jett, 439 F.3d at 1096).  "Deliberate indifference is a high legal

19  standard," Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004), and is shown by "(a) a

20  purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm

21  caused by the indifference."  Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096).  The

22  requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of

23  due care.  Snow, 681 F.3d at 985 (citation and quotation marks omitted).

24        "Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of

25  action."  Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle v.

26  Gamble, 429 U.S. 97, 105-06 (1976)).

27        Further, "[a] difference of opinion between a physician and the prisoner—or between

28  medical professionals—concerning what medical care is appropriate does not amount to

1  deliberate indifference."  Snow, 681 F.3d at 987 (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th

2  Cir. 1989)).  Rather, a plaintiff is required to show that the course of treatment selected was

3  "medically unacceptable under the circumstances" and that the defendant "chose this course in

4  conscious disregard of an excessive risk to plaintiff's health."  Snow, 681 F.3d at 988 (quoting

5  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996)).

6        V.        Discussion re:  Alleged Delay in Cancer Treatment

7              A.   Undisputed Facts

8        Plaintiff had an esophagogastroduodenoscopy ("EGD") diagnostic procedure at MCSP on

9  January 29, 2015.

10       The EGD laboratory test results were reported to defendant Horowitz, a staff physician at

11  MCSP, on February 6, 2015.  The test results included a finding of Barrett's esophagus and

12  metaplasia, which is abnormal change in the nature of the tissue.  Later that same day, defendant

13  Horowitz notified plaintiff (apparently in writing) that he was being scheduled for a follow-up

14  medical appointment concerning the tests.

15       On February 11, 2015, defendant Horowitz examined plaintiff.  She noted the EGD

16  findings of Barrett's esophagus and metaplasia, discussed them with plaintiff, and submitted a

17  physician's Request for Services ("RFS") for plaintiff to have a follow-up consultation with a

18  gastroenterology specialist.

19       On February 23, 2015, defendant Smith, as the Chief Physician and Surgeon at MCSP,

20  approved the RFS made by defendant Horowitz for plaintiff to have the gastroenterology

21  consultation.

22       On March 10, 2015, plaintiff was seen by Dr. Saipher at MCSP.  Dr. Saipher noted that an

23  RFS had been submitted by defendant Horowitz for plaintiff to have a follow-up gastroenterology

24  consultation, and that plaintiff would then have further care per protocol and as clinically

25  indicated.

26       On May 5, 2015, plaintiff had a gastroenterology consultation with Dr. Sheikh.  Dr.

27  Sheikh recommended that plaintiff have a repeated upper GI endoscopy and a repeat of biopsies

28  to rule out definite dysplasia and make plans for further surveillance endoscopy and biopsies.

1    On May 18, 2015, defendant Horowitz saw plaintiff.  Defendant Horowitz told plaintiff

2  that he was being scheduled for the EGD as per the gastroenterology consultation

3  recommendation.  Defendant Horowitz wrote an RFS for the repeat EGD, requesting it be

4  performed within thirty days if possible.

5    On May 22, 2015, defendant Smith approved the RFS for the repeat EGD.

6    On May 30, 2015, plaintiff submitted a request for the status of his repeat EGD.  The

7  nurse's response, completed on June 5, 5, 2015, informed him that a repeat EGD had been

8  ordered and should be scheduled in July 2015.

9    On June 11, 2015, defendant Smith approved an RFS for plaintiff's repeat EGD.  This was

10  a duplicate of the RFS written by defendant Horowitz on May 18, 2015.

11    On June 30, 2015, the repeat EGD was performed and biopsies taken.  The biopsy results

12  stated moderately differentiated adenocarcinoma arising in association with Barrett's esophagus.

13  The biopsy results were reviewed by Dr. James Miller on July 3, 3015, who noted that plaintiff

14  needed to see surgery and oncology as soon as possible.  In a further note dated July 6, 2015, Dr.

15  Miller noted that he had spoken to defendant Smith to see that referrals were made.  An RFS for

16  an urgent referral to oncology was written and approved on July 6, 2015.

17    On July 7, 2015, defendant Horowitz reviewed the biopsy results.  Another medical staff

18  member. M. Saiffer, wrote an order for plaintiff to be seen by his Primary Care Provider ("PCP")

19  physician on July 9, 2015, to discuss the significant biopsy results.  Defendant Horowitz

20  (plaintiff's PCP) wrote a notification to plaintiff of the appointment.

21    On July 8, 2015, plaintiff had an oncology consultation with Dr. Amandeep Gill, for

22  further recommendations and a treatment plan following the results of the EGD biopsy.  Dr.

23  Gill recommended that plaintiff have a whole-body PET/CT scan.  If the scan did not show any

24  metastasis (mets) or any lymphadenopathy, he recommended plaintiff have another endoscopic

25  ultrasound to find the thickness of the cancer.  If the thickness was less than a specified amount

26  and no lymph nodes were positive, he recommended plaintiff go for resection followed by

27  chemotherapy or radiation if required.  If the PET/CT scan showed metastatic disease or lymph

28  nodes, recommended plaintiff be referred to him as soon as possible with that report, for further

1  discussion.  If the PET/CT scan showed no metastasis and the endoscopic ultrasound showed

2  cancer thickness more than a specified amount, he indicated plaintiff would be a candidate for

3  chemotherapy and then dissection.

4      On July 8, 2015, defendant Horowitz wrote an RFS for plaintiff to have the PET/CT scan

5  on an urgent basis, and an RFS for plaintiff to have an endoscopic ultrasound on an urgent basis,

6  both as recommended by Dr. Gill.  Defendant Smith approved the RFS for the PET/CT scan the

7  same day.  Another physician approved the RFS for the endoscopic ultrasound the next day.

8      On July 10, 2015, Dr. Chau saw plaintiff at MCSP.  Dr. Chau interviewed plaintiff and

9  reviewed his medical records.  He noted an oncology consultation recommendation for a PET

10  scan and confirmed that an RFS for the scan had already been submitted by defendant Horowitz.

11  He also noted the further recommendations by oncology on how to proceed after the scan,

12  including with a plan for plaintiff to follow-up with the yard physician in about 2-3 weeks to

13  reassess and follow up after the PET scan report.

14      Plaintiff had the PET/CT scan on July 16, 2015.  The impression results were of no

15  definite lymphadenopathy or evidence of metastatic disease; because plaintiff had a hiatal hernia

16  the evaluation for lymphadenopathy around the diaphragm area was suboptimal.  Defendant

17  Horowitz received and reviewed the results on July 23, 2015.  Defendant Horowitz wrote an RFS

18  for an urgent specialty chest CT scan so that the area around the diaphragm could be better seen

19  and treatment recommendations considered.  Defendant Smith approved the RFS on July 24,

20  2015.  Defendant Horowitz indicated that plaintiff should return for follow-up care after the CT

21  scan in 2-4 weeks.

22      On July 28, 2015, plaintiff underwent the endoscopic ultrasound and EGD that had been

23  recommended by Dr. Gill.  The diagnostic impression was of a localized nodule concerning the

24  area of adenocarcinoma per previous biopsies.  The recommendation of the endoscopist, Dr.

25  Sharma, was for plaintiff to have an EGD with endoscopic mucosal resection (EMR) in one to

26  two weeks.[2]

27  _____

28  [2]  EMR is a procedure to remove early-stage cancer and precancerous growths from the lining of
the digestive tract.  See https://www.mayoclinic.org/tests-procedures/endoscopic-mucosal-

1     Plaintiff did not have the CT scan scheduled for July 29, 2015.[3]

2     On July 30, 2015, defendant Horowitz saw plaintiff and they discussed his prior

3 endoscopy with EGD test results.  Defendant Horowitz wrote an RFS for him to have esophageal

4 resection and EGD with EMR procedures at UC Davis medical facility, as had been

5 recommended by the oncologist, on an urgent basis.  At this time, defendant Horowitz anticipated

6 that these services would occur within approximately two weeks, with the specific procedures to

7 be determined and directed by the surgical and oncology physicians at the UC Davis facility.

8     On August 11, 2015, plaintiff was seen by Dr. Jackson at MCSP.  He had missed the

9 surgical EGD and EMR procedure because he had eaten and had been rescheduled to have the

10 surgery the next week.  Plaintiff asked to speak with the gastroenterology specialist before

11 undergoing the EGD with EMR.

12     On August 11, 2015, plaintiff had a gastroenterology consultation with Dr. Sheikh.  Dr.

13 Sheikh recommended that plaintiff be scheduled for the EMR that had been recommended by Dr.

14 Sharma.

15     On August 20, 2015, plaintiff was mistakenly transported by custody staff to San Joaquin

16 General Hospital, rather than the UC Davis health care facility, for the EGD and EMR, and he

17 returned to MCSP having missed the appointment.

18     On September 2, 2015, plaintiff was transported to the UC Davis facility for a

19 consultation, where it was recommended that he have the EGD and EMR procedure there in one

20 to two weeks.  Dr. Sheikh wrote an order for plaintiff to have the EGD and EMR at UC Davis as

21 scheduled, which defendant Smith approved the next day.

22     On September 3, 2015, plaintiff was seen by nurse practitioner Clark-Barlow at MCSP,

23 who wrote an RFS and orders for plaintiff to have a chest CT and a Lexiscan cardiac evaluation

24 as pre-operative testing procedures to the EGD and EMR.

25 ////

26 _____
resection/about/pac-20385213.

27

28 [3]  The parties dispute why plaintiff did not have the CT scan on July 29, 2015.  However, this
dispute is not material.

9

On September 8, 2015, Dr. Rudas at MCSP wrote an RFS for plaintiff to have a pulmonary function test ("PFT") as a preoperative test to the EGD and EMR.  This RFS was approved on September 9, 2015, although it is unclear who made the approval.  (ECF No. 60-4 at 40.)

On September 10 and 11, 2015, plaintiff was seen by Dr. Chau at MCSP concerning his administrative health care appeals to have the missed August 20, 2015 EGD and EMR surgery rescheduled and his disagreements concerning his treatment plan.  Dr. Chau's review confirmed the activities that were scheduled and pending for plaintiff concerning the matters and determined that the matters had been addressed.

On September 15, 2015, plaintiff underwent the chest CT scan.

On September 18, 2015, plaintiff had a follow-up appointment to the chest CT scan, but the results were not yet available, and the follow-up was rescheduled to the next five to seven days, to discuss the results.

On September 30, 2015, plaintiff was seen by Dr. Chau to address the status of the PFT, CT scan and Lexiscan procedures.  Dr. Chau noted that the CT scan result/report was not yet available and requested it; he noted the PFT had been done and to request the report; and he noted it had been determined that plaintiff had had a prior Lexiscan in November 2014 which the UC Davis specialist determined meant there was no need to repeat the test.  Dr. Chau concluded that plaintiff should follow-up with his Primary Care Provider in two weeks with regard to the PFT and CT scan results.

On October 5, 2015, defendant Horowitz saw plaintiff.  Defendant Horowitz noted the status of his pre-operative treatment procedures, including that there was a small dot detected on the CT scan which might be metastasis or be old granuloma not detected on previous examinations.  Defendant Horowitz wrote an RFS for the EMR with possible esophagectomy on an urgent basis.  It appears that Dr. Rudas approved this RFS on October 5 or 6, 2015.  (ECF No. 60-5 at 31.)

On October 21, 2015, plaintiff had a consultation at the UC Davis surgical clinic with Dr. Amaral.  The assessment in Dr. Amaral's report indicates that he discussed management options

1  for plaintiff's early stage esophageal cancer with the gastroenterology department, and they were

2  in agreement that a definitive operation would prove to be a lasting management option, versus

3  EMR.  Plaintiff was scheduled for a transhiatal esophagectomy with cervical esophagogastric

4  anastomosis.  The risks and benefits of the procedure were discussed with plaintiff and he

5  provided consent.

6        On October 22, 2015, plaintiff underwent the esophagectomy, endoscopy and related

7  surgical procedures.

8              B.   Defendant Horowitz

9        Defendants argue that defendant Horowitz is entitled to summary judgment because she

10  did not act with deliberate indifference.  Defendants argue that defendant Horowitz did not ignore

11  or refuse to treat plaintiff, and the treatment she provided was consistent with the standard of care

12  and skill ordinarily exercised by reputable medical doctors.

13        *Defendant Horowitz's Submissions of RFSs on February 11, 2015 and May 18, 2015*

14        It is undisputed that on February 11, 2015, defendant Horowitz submitted an RFS for

15  plaintiff to have a follow-up consultation with a gastroenterology specialist based on the results of

16  the January 29, 2015 EGD, which found Barrett's esophagus and metaplasia.  The February 11,

17  2015 RFS was not requested as urgent.  (See ECF No. 60-5 at 11.)  The request was classified as

18  "routine."  (Id.)  It is undisputed that plaintiff had the follow-up consultation on May 5, 2015.

19        It is undisputed that defendant Horowitz next saw plaintiff on May 18, 2015.  On this date,

20  defendant Horowitz wrote an RFS for the repeat EGD, as recommended by Dr. Sheikh following

21  his May 5, 2015 consultation with plaintiff.  Defendant Horowitz again classified the RFS as

22  routine, rather than urgent, although she requested that the repeat EGD occur "within 30 days if

23  possible."  (ECF No. 60-5 at 14.)  The repeat EGD was performed on June 30, 2015, and biopsies

24  were taken.  The biopsies stated moderately differentiated adenocarcinoma arising in association

25  with Barrett's esophagus.

26        As discussed above, in his verified complaint, plaintiff alleges that his brother had

27  previously died from esophageal adenocarcinoma, beginning with Barrett's esophagus.  (ECF No.

28  9 at 12.)  Plaintiff alleges that defendant Horowitz knew that his brother had died from this

1   disease.  (Id.)

2          Defendants do not address plaintiff's claim that defendant Horowitz knew that his brother

3   had died from esophageal cancer.  If defendant Horowitz knew that plaintiff's brother died from

4   esophageal cancer, then it is unclear why she did not issue the February 11, 2015 and May 18,

5   2015 RFS on an urgent, rather than routine, basis.[4]  Without additional information regarding

6   whether defendant Horowitz knew about plaintiff's brother at the time she issued these RFSs, the

7   undersigned cannot determine whether defendant Horowitz acted with deliberate indifference at

8   the time she issued these RFSs on a routine basis.  In essence, by failing to address plaintiff's

9   claim that defendant Horowitz knew about the death of his brother, defendants have failed to

10  meet their burden of proving that there is an absence of evidence to support plaintiff's claim that

11  defendant Horowitz acted with deliberate indifference by issuing these chronos on a routine basis.

12  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d

13  376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325).  For these reasons, the

14  undersigned recommends that defendant Horowitz's motion for summary judgment on the

15  grounds that she did not act with deliberate indifference when she issued the February 11, 2015

16  and May 18, 2015 RFSs on a routine, as opposed to urgent, basis be denied.

17          The undersigned also observes that when a prisoner alleges that delay of medical

18  treatment evinces deliberate indifference, the prisoner must show that the delay led to further

19  injury.  See Shapley v. Nevada Bd. Of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)

20  (holding that "mere delay of surgery, without more is insufficient to state a claim of deliberate

21  indifference.)

22          In this case, plaintiff alleges that as a result of defendant Horowitz's failure to request that

23  he be seen by the gastroenterologist on an urgent basis, his medical treatment was delayed.

24  Plaintiff alleges that as a result of this delay, and the other delays alleged, his condition worsened.

25  Plaintiff offers no expert evidence in support of this claim.  However, as discussed above, it is

26  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27  [4]  Plaintiff does not claim that the results of his January 29, 2015 EGD would have warranted
    further testing on an urgent basis had he not had a family history of esophageal cancer.  In other
    words, plaintiff's claim of deliberate indifference is based on defendant Horowitz's alleged

28  knowledge of his family history of esophageal cancer.

undisputed that in February 2015, plaintiff was diagnosed with metaplasia, i.e., abnormal change in the nature of the tissue.  It is undisputed that the results of the biopsy taken on June 30, 2015, stated moderately differentiated adenocarcinoma arising in association with Barrett's esophagus.

Defendants do not move for summary judgment on the grounds that the alleged delays allegedly caused by defendant Horowitz's issuance of the February 11, 2015 and May 18, 2015 RFSs on a routine basis did not lead to further injury.  For this reason, the undersigned does not reach this issue.

For the reasons discussed above, the undersigned recommends that defendant Horowitz be denied summary judgment as to plaintiff's claim that she acted with deliberate indifference by causing a delay in plaintiff's treatment when she issued the February 11, 2015 and May 18, 2015 RFSs on a routine, rather than urgent, basis.

*Defendant Horowitz's Treatment of Plaintiff After May 18, 2015 until the October 22, 2015 Surgery*

For the reasons stated herein, the undersigned finds that the evidence demonstrates that defendant Horowitz did not act with deliberate indifference to plaintiff's serious medical needs in her treatment of plaintiff after May 18, 2015, until plaintiff's October 22, 2015 surgery.  As discussed herein, the evidence demonstrates that during this time period, defendant Horowitz made urgent referrals for plaintiff's medical care.  While there were some delays in plaintiff's treatment, it does not appear that these delays were attributable to defendant Horowitz.

The undisputed evidence demonstrates that after May 18, 2015, defendant Horowitz's next involvement in plaintiff's treatment was on July 7, 2015, when she wrote a notification for plaintiff to discuss the significant biopsy results.  On July 8, 2015, defendant Horowitz wrote an RFS for plaintiff to have the PET/CT scan and endoscopic scan, as recommended by Dr. Gill on July 8, 2015, on an urgent basis.

Plaintiff had the PET/CT scan on July 16, 2015, which was suboptimal around the diaphragm.  In response to the suboptimal PET/CT scan, on July 23, 2015, defendant Horowitz wrote an RFS for an urgent specialty chest CT scan.

////

13

On July 28, 2015, plaintiff had the endoscopic ultrasound and EGD recommended by Dr. Gill, and as ordered by defendant Horowitz on an urgent basis on July 8, 2015.  The recommendation of the endoscopist was for plaintiff to have an EGD with EMR in one to two weeks.

On July 30, 2015, defendant Horowitz saw plaintiff and wrote an RFS for plaintiff to have an esophageal resection and EGD with EMR at UC Davis medical facility, as had been recommended by the oncologist, on an urgent basis.

Defendant Horowitz's treatment of plaintiff, discussed above, does not demonstrate deliberate indifference.  Defendant Horowitz's RFSs were all issued on an urgent basis.  The requests for testing in the RFSs were based on recommendations from the specialists who examined plaintiff.  In addition, it appears that the further testing ordered by defendant Horowitz, discussed above, was conducted in a timely manner.

After defendant Horowitz wrote the July 30, 2015 RFS for plaintiff to have the EGD and EMR at UC Davis medical facility on an urgent basis, defendant Horowitz did not see plaintiff again until October 5, 2015.  Between July 30, 2015, and October 5, 2015, various delays occurred which no evidence demonstrates were attributable to defendant Horowitz.  For example, on August 20, 2015, plaintiff was mistakenly transported to the San Joaquin General Hospital, rather than UCD health care facility for the EGD and EMR.

On September 2, 2015, plaintiff was transported to UCD health care facility, where it was recommended that he have the EGD and EMR procedure in one to two weeks.  Plaintiff did not return to the UCD health care facility until October 21, 2015 where, the following day, he had surgery.  It appears that plaintiff's return to the UCD health care facility did not occur in one to two weeks as originally planned due to pre-surgery testing.  After the pre-surgery testing was complete, on October 5, 2015, defendant Horowitz wrote an RFS for the EMR with possible esophagectomy on an urgent basis.  The record contains no evidence that defendant Horowitz was involved in or otherwise responsible for any delays in plaintiff's pre-surgery testing.

Accordingly, for the reasons discussed above, the undersigned recommends that defendant Horowitz be granted summary judgment as to plaintiff's claim that she acted with deliberate

14

indifference in her treatment of plaintiff after May 18, 2015, until plaintiff's October 22, 2015 surgery.

### C.   Defendant Smith

Defendants argue that defendant Smith should be granted summary judgment because he did not act with deliberate indifference toward plaintiff.  Defendants contend that for events pertaining to this lawsuit, defendant Smith's actions were entirely within the scope of his administrative review and approval of RFSs.  Defendants contend that defendant Smith never denied an RFS for plaintiff and provided prompt approvals.

It is undisputed that defendant Smith's only involvement in the events alleged in plaintiff's claim alleging delay of treatment were to approve RFSs for plaintiff's care:  1) on February 23, 2015, defendant Smith approved the RFS submitted by defendant Horowitz on February 11, 2015, for plaintiff's follow up gastroenterology consultation on a routine basis; 2) on May 22, 2015, defendant Smith approved the RFS submitted by defendant Smith on May 18, 2015 for the repeat EGD on a routine basis; 3) on June 11, 2015, defendant Smith submitted a duplicate approval of the May 18, 2015 RFS; 4) on July 8, 2015, defendant Smith approved the RFS submitted by defendant Horowitz that same day for plaintiff to have a PET/CT and an endoscopic ultrasound on an urgent basis; 5) on July 24, 2015, defendant Smith approved the RFS submitted by defendant Horowitz on July 23, 2015, for plaintiff to have a specialty chest CT scan on an urgent basis; 6) on September 3, 2015, defendant Smith approved the order written by defendant Sheikh on September 2, 2015, for plaintiff to have the EGD and EMR at UC Davis in one to two weeks, as scheduled.

In his declaration submitted in support of the summary judgment motion, defendant Smith states that he does not recall ever meeting or encountering plaintiff.  (ECF No. 60-6 at 2.)

The undersigned first considers whether defendant Smith acted with deliberate indifference by approving the "routine basis" RFSs submitted by defendant Horowitz on February 11, 2015, and May 18, 2015.

If defendant Smith knew of the death of plaintiff's brother from esophageal cancer when he approved the February 11, 2015 and May 18, 2015 RFSs, the undersigned could not find that

1   defendant Smith did not act with deliberate indifference when he approved these RFSs.  The

2   undersigned would require further explanation for defendant Smith's failure to convert these

3   routine RFS to urgent RFS.

4           However, the record contains no evidence demonstrating that defendant Smith had

5   knowledge of plaintiff's brother when he approved these RFSs.  Plaintiff does not dispute that

6   defendant Smith did not physically examine him during this time.  Thus, it appears that defendant

7   Smith's knowledge of plaintiff's relevant health problems was limited to the information

8   contained in the RFSs prepared by defendant Horowitz, which did not mention plaintiff's brother.

9   Because the record contains no evidence that defendant Smith knew that plaintiff had a family

10  history of esophageal cancer, the undersigned finds that defendant Smith did not act with

11  deliberate indifference when he approved the "routine basis" February 11, 2015, and May 18,

12  2015 RFSs.

13          The remaining requests approved by defendant Smith were for urgent treatment.  For this

14  reason, the undersigned finds that defendant Smith did not act with deliberate indifference when

15  approving these requests for care.

16          There is no evidence linking defendant Smith to the other alleged delays in plaintiff's

17  treatment.  Accordingly, defendant Smith should be granted summary judgment to the extent

18  plaintiff alleges that defendant Smith is responsible for these delays.

19          Accordingly, for the reasons discussed above, the undersigned recommends that defendant

20  Smith be granted summary judgment as to plaintiff's claim that he acted with deliberate

21  indifference to plaintiff's serious medical needs during the time discussed above.

22          VI.      Alleged Denial of Requests for In-Cell Feeding and Wedge Pillow

23                   A.   Undisputed Evidence

24          Most of the evidence regarding these claims is undisputed, as set forth herein.  To the

25  extent there are disputes, they are noted below.

26          On February 23, 2016, plaintiff saw Dr. Huynh upon his return to MCSP after his surgery.

27  Plaintiff told Dr. Huynh that his wedge pillow did not transfer with him and he requested one to

28  keep his head elevated at thirty degrees.  Defendant Huynh wrote an order for plaintiff to obtain a

1  wedge pillow and for plaintiff to have in-cell feeding for thirty days.

2       On February 29, 2016, MCSP medical staff received plaintiff's Health Care Services

3  Request Form ("HCSRF"), inquiring as to the status of the wedge pillow.  Plaintiff was referred

4  to a staff physician (not defendant Horowitz) who, on March 2, 2020, wrote an order to dispense

5  two pillows because MCSP did not issue wedge pillows.

6       On March 10, 2016, MCSP medical staff received plaintiff's HCSRF to raise his bed

7  thirty degrees from waist to head.  The nurse who saw plaintiff in response to the request noted

8  that plaintiff had been given an order for a wedge pillow and told that MCSP did not have wedge

9  pillows; that plaintiff would be given an extra pillow when one became available, and that he had

10  been offered extra blankets in the meantime, with input on how to make the blankets work.

11       On March 15, 2016, plaintiff saw Dr. Huynh and they addressed plaintiff's request for a

12  wedge pillow and cell feeding.  Plaintiff told Dr. Huynh that he was "throwing up every day due

13  to unable to eat too much, needs to eat 6 small meals a day so needs cell feed."  (60-4 at 69.)

14       Dr. Huynh told plaintiff that per the warehouse, wedge pillows were not issued at MCSP.

15  Plaintiff told Dr. Huynh that it took four pillows to elevate.  Dr. Huynh wrote an order for

16  plaintiff to have four pillows in place of a wedge pillow.  Plaintiff told Dr Huynh that his cell-

17  feed chrono had been removed.  Dr. Huynh was unable to find cell feed instructions from

18  plaintiff's thoracic surgeon, whom plaintiff referenced, and they discussed having plaintiff

19  follow-up on the matter by providing the instructions, which plaintiff indicated he had a copy of.

20       On March 17, 2016, Dr. Huynh discontinued plaintiff's order for four pillows, and ordered

21  two blankets instead of a wedge pillow.

22       On March 17, 2106, plaintiff submitted a Health Care Services Request Form.  (Id. at 72.)

23  Plaintiff wrote, in part,

24            Please restore needed cell feed.  I must:  "take small bites—eat
             slowly—chew thoroughly—eat 6 or more small meals per day—
25            drink liquids ½ hour before and after meals, not with meals, etc."  I
             vomit when no following these procedures.
26

27  (Id. at 72.)

28       On March 19, 2016, plaintiff was seen by a nurse in response to his requests for a cell-

feed chrono and four pillows.  The nurse told plaintiff the order was changed to two blankets instead of four pillows.  The nurse told plaintiff the chrono request would be addressed at a follow-up doctor's appointment and wrote an order for a three-day cell-feed in the interim.

On March 25, 2016, plaintiff saw Dr. Atienza, and requested a wedge pillow and continuation of his cell-feed chrono.  Dr. Atienza wrote, in part, "Since surgery, he has been having solid and liquid dysphagia.  He has reflux and vomiting (regurgitation?) and also 'dumping syndrome.'" (Id. at 76.)

Dr. Atienza ordered a non-formulary request for a wedge pillow approval, and a cell-feed order through April 2, 2016.  As discussed herein, the non-formulary request for a wedge pillow was apparently denied, although it is not clear who denied this request or when.

On April 26, 2016, defendant Horowitz wrote an accommodation chrono for plaintiff which included extra time for meals.

On April 28, 2016, defendant Horowitz saw plaintiff, noting that she had not seen him since October 2015.  Defendants claim that during this examination, plaintiff requested a cell-feed, not permanent.  Plaintiff alleges that he requested a cell-feed, permanent, during this examination.  Defendant Horowitz noted that plaintiff had a chrono for extra time at meals and was refusing late night snacks.  Defendant Horowitz ordered a cell-feed until plaintiff's weight increased and wrote an RFS for plaintiff to have a dietician consultation.

The records from the April 28, 2016 exam do not reflect that defendant Horowitz addressed plaintiff's request for a wedge pillow or need for additional blankets or pillows to elevate his head thirty degrees.  (ECF No. 60-5 at 34.)  It appears that by this time, Dr. Atienza's non-formulary request for plaintiff to receive a wedge pillow had been denied.  (Id.)

On May 3, 2016, defendant Smith approved the RFS for plaintiff to have a dietician consultation on May 3, 2016.

On May 17, 2106, defendant Horowitz saw plaintiff and noted that he had a chrono for a cell-feed, and he needed extra time for meals when the chrono expired on June 1, 2016.  The records from this exam do not reflect that defendant Horowitz addressed plaintiff's request for a wedge pillow or need for additional blankets or pillows to elevate his head thirty degrees.  (Id. at

1    36.)

2          On June 2, 2016, plaintiff was seen by a nurse in response to his request that his cell-feed

3    chrono be continued.  The request was denied, and plaintiff was scheduled for a follow-up

4    doctor's appointment on June 9, 2016 and instructed to raise the cell-feed issue to the doctor at

5    that time.

6          On June 9, 2016, defendant Horowitz interviewed plaintiff and reviewed his medical

7    records, as part of the process for the response to his health care appeal log number MCSP HC

8    16048591, by which appeal he requested four pillows or to buy his own wedge pillow.  In her

9    June 9, 2016 response to this request, defendant Horowitz wrote,

10   DISPOSITION:

11
12            Bedding, clothing and security restraints are not under the
              jurisdiction of the medical department.  You may request these items
              from the security staff.  You can roll up your clothing, bedding, etc.
13            to try to elevate your body.  A wedge pillow has already been
              requested and denied.

14   (ECF No. 60-5 at 37.)

15         On June 15, 2016, defendant Horowitz saw plaintiff concerning his request for a cell feed

16   authorization.  (Id. at 38.)  In her declaration, defendant Horowitz states, "I noted that he had been

17   allowed extra time at meals since June 1, 2016, and that his cell feed had been discontinued two

18   weeks ago.  I wrote a chrono that included extra time for meals."  (Id. at 4.)  From this statement,

19   the undersigned reasonably infers that defendant Horowitz denied plaintiff's request for

20   permanent in-cell feeding status on this date.

21         Defendants state that at his deposition, plaintiff testified that sometime after June 2016,

22   defendant Smith approved plaintiff being put on a permanent in-cell feed status.  In the

23   opposition, plaintiff claims that Dr. Ruda ordered him to receive permanent in-cell feed status.

24         Defendants also state that plaintiff testified at his deposition that Dr. Hong later put in an

25   order for plaintiff to have six pillows, but he did not get them because a lot of inmates were

26   coming into the prison and they were running short on pillows.  Plaintiff testified that he received

27   six blankets and was able to make them into a wedge to sleep at a thirty-degree angle.

28   ////

                                                    19

1        B.   Defendant Horowitz

2            In the summary judgment motion, defendants do not dispute plaintiff's claim that

3    plaintiff's surgeon ordered plaintiff to use a wedge pillow to elevate his head and neck thirty

4    degrees.  Defendants do not dispute plaintiff's claim that the surgeon ordered plaintiff to eat six

5    small meals per day.  In other words, defendants do not dispute that plaintiff had a serious

6    medical need that required him to elevate his head and neck thirty degrees and to be able to eat

7    six small meals per day.  Instead, defendants argue that defendant Horowitz should be granted

8    summary judgment because her limited involvement in plaintiff's care following his return to

9    MCSP did not demonstrate deliberate indifference with respect to plaintiff's request for a wedge

10   pillow and in-cell feeding.

11           *Analysis—Plaintiff's Request for a Wedge Pillow*

12           Defendant Horowitz did not address plaintiff's request for a wedge pillow when she

13   examined plaintiff on April 28, 2016, and May 17, 2016.  Accordingly, these dates are not

14   relevant to plaintiff's claim alleging that defendant Horowitz denied his request for a wedge

15   pillow or other means to elevate his head and neck 30 degrees.

16           By the time defendant Horowitz interviewed plaintiff for his grievance on June 9, 2016,

17   the non-formulary request for plaintiff to have a wedge pillow had been denied.[5]  It appears that

18   on June 9, 2016, plaintiff was using two blankets to elevate his head and throat.  In the grievance

19   addressed by defendant Horowitz on June 9, 2016, plaintiff requested four pillows because the

20   two blankets did not sufficiently elevate his head.[6]  In her response, defendant Horowitz denied

21   plaintiff's request for four pillows, and advised plaintiff to ask security staff for extra pillows

22   because bedding was not under the jurisdiction of the medical department.

23           For the following reasons, the undersigned cannot find that defendant Horowitz did not

24   act with deliberate indifference when she denied plaintiff's request for four pillows on June 9,

25   _____

26   [5]  It appears that defendant Horowitz was not responsible for the denial of the non-formulary
     request.

27

28   [6]  The undersigned cannot locate in the record a copy of the actual grievance filed by plaintiff
     addressed by defendant on June 9, 2016.

                                                20

1    2016.  Defendants apparently do not dispute plaintiff's claim, made in the grievance, that the two

2    blankets he used did not raise his head and neck thirty degrees.  Defendants also do not

3    apparently dispute plaintiff's claim, made in the grievance, that he required four pillows to

4    elevate his head.  Defendants apparently argue that defendant Horowitz did not act with deliberate

5    indifference in denying this grievance because she did not have the authority to issue additional

6    pillows to plaintiff.

7         If defendant Horowitz did not have the authority to provide plaintiff with additional

8    pillows, then the undersigned would find that she did not act with deliberate indifference to

9    plaintiff's serious medical needs when she denied his request for additional pillows.  However,

10   the record discussed above contains orders and requests by other medical staff for plaintiff to

11   have additional pillows and blankets.  For example, on March 2, 2016, medical personnel wrote

12   in plaintiff's records, "Dispense 2 pillows as MCSP does not issue wedge pillows."  (ECF No.

13   60-4 at 66.)  On March 15, 2016, Dr. Huynh ordered four pillows for plaintiff.  (Id. at 70.)  On

14   March 17, 2016, Dr. Huynh discontinued the order for four pillows and instead ordered two

15   blankets for plaintiff.  (Id. at 71.)

16        However, on June 29, 2016, plaintiff's appeal from defendant Horowitz's denial of his

17   grievance requesting four pillows was denied at the Institution Level by Dr. Chau.  (Id. at 4.)   Dr.

18   Chau upheld defendant Horowitz's finding that bedding, clothing and security restraints are not

19   under the jurisdiction of the medical department.  (Id. at 5.)

20        The record contains conflicting evidence regarding whether medical staff had the

21   authority to order extra pillows and blankets for plaintiff.  Therefore, without further explanation

22   of defendant Horowitz's denial of plaintiff's grievance requesting four pillows to elevate his

23   head, the undersigned cannot determine whether she acted with deliberate indifference when

24   denying this grievance.

25        In the summary judgment motion, citing Mann v. Adams, 855 F.2d 639 (9th Cir. 1988),

26   defendants argue that defendant Horowitz cannot be liable based on her denial of plaintiff's

27   grievance on June 9, 2016, on the grounds that there is no constitutional right to an inmate appeal

28   or grievance process.

1   Actions in reviewing and denying administrative appeals or grievances do not necessarily

2   cause or contribute to a constitutional violation.  See Ramirez v. Galaza, 334 F.3d 850, 861 (9th

3   Cir. 2003) ("Inmates lack a separate constitutional entitlement to a specific prison grievance

4   procedure."); Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1998) ("There is no legitimate claim

5   of entitlement to a grievance procedure.").  "Rather, a plaintiff can only 'establish liability on the

6   part of defendants involved in the administrative grievance process under the Eighth Amendment

7   by alleging his appeal put defendants on notice that he had a serious medical need that was not

8   being met, and their denial, therefore, constituted deliberate indifference to his medical need.'"

9   Moss v. Entzel, 2018 WL 376925 at *4 (Jan. 11, 2018 C.D. Cal.) (quoting Brammer v. Yates,

10   2011 WL 5873393, at *5 (E.D. Cal. No. 22, 2011)).

11   In the instant case, the record demonstrates that defendant Horowitz was not acting as a

12   supervisor when she addressed plaintiff's grievance on June 9, 2016.  In other words, defendant

13   Horowitz was not reviewing medical care provided by another physician when she addressed

14   plaintiff's grievance.  Instead, defendant Horowitz directly addressed plaintiff's request for

15   pillows to elevate his head thirty degrees.  For these reasons, defendants' argument that defendant

16   Horowitz is not liable based on her denial of plaintiff's grievance is without merit.

17   *Analysis--Plaintiff's Request for In-Cell Feeding Status*

18   As discussed above, defendants do not dispute plaintiff's claim that the surgeon told him

19   to eat six small meals per day following his surgery.  Defendants argue that defendant Horowitz

20   did not act with deliberate indifference to plaintiff's serious medical need that required him to eat

21   six small meals per day.

22   Plaintiff's main claim against defendant Horowitz for denying him in-cell feeding status

23   appears to be based on her denial of his request for in-cell feeding status on June 15, 2016.  Prior

24   to that time, defendant Horowitz's only involvement in plaintiff's request for in-cell feeding

25   status was on April 28, 2016, when she authorized in-cell feeding until plaintiff's weight

26   increased.

27   In the summary judgment motion, defendants make the following argument regarding

28   why defendant Horowitz should be granted summary judgment as to this claim:  "On June 15,

1   2015, [defendant Horowitz] continued his chrono for extra time at meals, and noted that his cell

2   feed had been discontinued two weeks previously.  (DUF 45.)  Thus, to the limited extent she was

3   involved in Tenore's request for cell feeding and a wedge pillow, Dr. Horowitz was responsive

4   and acted appropriately."  (ECF No. 60-1 at 16.)

5          In undisputed fact no. 45, cited above, defendants assert that, "On June 15, 2016, Dr.

6   Horowitz saw Tenore concerning his request for a cell feed authorization.  Dr. Horowitz noted

7   that he had been allowed extra time at meals since June 1, 2016, and that his cell feed had been

8   discontinued two weeks ago.  Dr. Horowitz wrote a chrono that included extra time for meals.

9   (Horowitz decl. at & 16 and Ex. A p. 32-33.)."  (ECF No. 60-3 at 9.)

10         While defendant Horowitz issued a chrono granting plaintiff extra time to eat his meals on

11  June 15, 2016, defendants do not address why defendant Horowitz failed to renew plaintiff's in-

12  cell feeding chrono on this date.  As discussed above, defendants do not dispute plaintiff's claim

13  in the verified amended complaint that he had a serious medical need that required him to eat six

14  small meals per day.  In the verified amended complaint, plaintiff alleges that he required in-cell

15  feeding because the dining hall at MCSP is open twice per day for breakfast and dinner, and

16  prisoners are not allowed to bring food away from the dining hall other than their boxed lunch.

17  (ECF No. 9 at 21.)  Plaintiff alleges that as a result of the limited hours of the dining hall, he is

18  unable to split his two primary meals of breakfast or dinner in half.  (Id. at 21-22.)  Plaintiff

19  alleges he has no stomach in which to store/process a full meal and therefore must eat several

20  smaller meals or be forced into dumping syndrome.  (Id. at 22.)  Plaintiff alleges that he requires

21  the "crucial therapy of 5-6 small meals per day…"  (Id.)

22         While defendant Horowitz issued a chrono on June 15, 2016, for plaintiff to have extra

23  time to eat his meals, plaintiff's amended complaint alleges that he required in-cell feeding in

24  order to be able to eat 5 to 6 small meals per day, which he could not do with extra time to eat his

25  meals in the dining hall.  Because defendants fail to address why defendant Horowitz denied

26  plaintiff's request for in-cell feeding status on June 15, 2016, the undersigned cannot find that she

27  did not act with deliberate indifference when she denied this request.  Accordingly, defendant

28  ////

1     Horowitz should not be granted summary judgment as to this claim.[7]

2         C.   Defendant Smith

3       Defendants argue that the evidence discussed above demonstrates that defendant Smith

4 had no involvement in plaintiff's request for a wedge pillow and permanent in-cell feeding status

5 other than his approval of plaintiff's request for permanent in-cell feed status.

6       In his opposition to the pending motion, plaintiff alleges that Dr. Reda, and not Dr. Smith,

7 granted him in-cell feed status.  Plaintiff offers no other evidence demonstrating defendant

8 Smith's involvement in his request for a wedge pillow or in-cell feeding status.

9       The Civil Rights Act under which this action was filed provides as follows:

10           Every person who, under color of [state law] . . . subjects, or causes
to be subjected, any citizen of the United States . . . to the deprivation

11           of any rights, privileges, or immunities secured by the Constitution .
. . shall be liable to the party injured in an action at law, suit in equity,

12           or other proper proceeding for redress.

13 42 U.S.C. § 1983.

14       The statute requires that there be an actual connection or link between the actions of the

15 defendants and the deprivation alleged to have been suffered by plaintiff.  See Monell v.

16 Department of Social Servs., 436 U.S. 658 (1978) ("Congress did not intend § 1983 liability to

17 attach where . . . causation [is] absent."); Rizzo v. Goode, 423 U.S. 362 (1976) (no affirmative

18 link between the incidents of police misconduct and the adoption of any plan or policy

19 demonstrating their authorization or approval of such misconduct).  "A person 'subjects' another

20 to the deprivation of a constitutional right, within the meaning of  § 1983, if he does an

21 affirmative act, participates in another's affirmative acts or omits to perform an act which he is

22 legally required to do that causes the deprivation of which complaint is made."  Johnson v. Duffy,

23 588 F.2d 740, 743 (9th Cir. 1978).

24       Moreover, supervisory personnel are generally not liable under § 1983 for the actions of

25 their employees under a theory of respondeat superior and, therefore, when a named defendant

26

27    [7]   The medical records suggest reasons why defendant Horowitz may have denied plaintiff's request for in-cell feeding status on June 15, 2016.  However, defendants' summary judgment does not discuss these reasons.  It is not sufficient for defendants to merely cite to the medical

28 records without offering any explanation of their relevance.

1   holds a supervisorial position, the causal link between him and the claimed constitutional

2   violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979)

3   (no liability where there is no allegation of personal participation); Mosher v. Saalfeld, 589 F.2d

4   438, 441 (9th Cir. 1978) (no liability where there is no evidence of personal participation), cert.

5   denied, 442 U.S. 941 (1979).  Vague and conclusory allegations concerning the involvement of

6   official personnel in civil rights violations are not sufficient.  See Ivey v. Board of Regents, 673

7   F.2d 266, 268 (9th Cir. 1982) (complaint devoid of specific factual allegations of personal

8   participation is insufficient).

9        The undersigned finds that the record contains no evidence demonstrating defendant

10   Smith's involvement in plaintiff's request for a wedge pillow or permanent cell status.[8]  For this

11   reason, defendant Smith should be granted summary judgment as to these claims.

12        VII.    Qualified Immunity

13        A.   Legal Standard

14        "The doctrine of qualified immunity protects government officials 'from liability for civil

15   damages insofar as their conduct does not violate clearly established statutory or constitutional

16   rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223,

17   231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  In determining whether a

18   defendant is entitled to qualified immunity, the Court must decide (1) whether the facts shown by

19   plaintiff make out a violation of a constitutional right; and (2) whether that right was clearly

20   established at the time of the officer's alleged misconduct.  Pearson, 555 U.S. at 232.  To be

21   clearly established, a right must be sufficiently clear "that every 'reasonable official would [have

22   understood] that what he is doing violates that right.'"  Reichle v. Howards, 566 U.S. 658, 664

23

---

24   [8]  As discussed above, on March 25, 2016, Dr. Atienza submitted a non-formulary request for
25   plaintiff to have a wedge pillow.  This request was denied, although the record does not state who
     denied this request.  Defendant Smith is and was the Chief Physician and Surgeon at MCSP.  In
26   his declaration, defendant Smith does not describe his duties as including reviewing non-
     formulary requests.  (ECF No. 60-6.)  Defendant Smith does not list approval of Dr. Atienza's
27   non-formulary requests as one of his activities pertaining to this lawsuit.  (Id.)  For these reasons,
     the undersigned finds that the record does not show that defendant Smith denied Dr. Atienza's
28   non-formulary request for plaintiff to have a wedge pillow.

1    (2012) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)).

2        B.  Analysis

3        As discussed above, the undersigned recommends that defendant Horowitz be denied

4    summary judgment as to the following claims:  1) defendant Horowitz acted with deliberate

5    indifference when she classified the February 11, 2015, and May 18, 2015 RFSs as routine rather

6    than urgent; 2) defendant Horowitz acted with deliberate indifference when she denied plaintiff's

7    request for in-cell feeding status on June 15, 2016, and when she denied plaintiff's request for

8    four pillows to elevate his head and neck.  Accordingly, the undersigned herein considers whether

9    defendant Horowitz is entitled to qualified immunity as to these claims.

10        *February 11, 2015, and May 18, 2015 RFSs*

11        Plaintiff alleges that defendant Horowitz issued the February 11, 2015, and May 18, 2015

12    RFSs on a routine basis, despite knowing of his brother's death from esophageal cancer.  Plaintiff

13    alleges that his delay in receipt of treatment, as a result of the routine RFSs, caused him to

14    develop cancer.  Taking the facts in the light most favorable to plaintiff, the undersigned finds

15    that defendant Horowitz violated plaintiff's Eighth Amendment rights by failing to issue the

16    February 11, 2015, and May 18, 2015 RFSs on an urgent basis.  Pearson v. Callahan, 555 U.S.

17    223, 232 (2009).

18        The undersigned further finds that it has long been established that a medical professional

19    violates the Eighth Amendment by intentionally denying or delaying medical care for a serious

20    medical need.  See Estelle v. Gamble, 429 U.S. 97, 104-05 (1976).  Thus, based on plaintiff's

21    allegations, it would be clear to a reasonable doctor that failing to issue the February 11, 2015,

22    and May 18, 2015 RFSs on an urgent basis violated the Eighth Amendment.  Accordingly,

23    defendant Horowitz is not entitled to qualified immunity as to this claim.

24        In the summary judgment motion, defendants argue that in Lopez v. E.I. Tell, 2005 WL

25    1488896 (9th Cir. 2005), the Ninth Circuit held in an action for deliberate indifference similar to

26    plaintiff's claim that prison staff were entitled to qualified immunity.  In Lopez, the plaintiff

27    alleged that defendants were deliberately indifferent to his serious medical needs by failing to

28    treat his dissecting cellulitis.  2005 WL 1488896, at *1.  The Ninth Circuit found,

26

1
2
3
4
5

> The district court properly granted summary judgment for defendants on the grounds of qualified immunity because Lopez failed to raise a genuine issue of material fact as to whether it would be clear to a reasonable doctor under the circumstances that a delay in Lopez's scalp surgery would pose a substantial risk of serious harm. See Estate of Ford v. Ramirez–Palmer, 301 F.3d 1043, 1049–50 (9th Cir.2002) (holding that a prison official may be entitled to qualified immunity where he has a reasonable, but mistaken, belief about the facts or about what the law requires in a given situation).

6
7
8
9

> At most, Lopez raised an issue as to whether the prison doctors' decision to delay surgery constituted medical negligence, but "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle v. Gamble, 429 U.S. 97, 106, (1976). Moreover, "'a difference of medical opinion' as to the need to pursue one course of treatment over another [is] insufficient, as a matter of law, to establish deliberate indifference."

10
Id.

11   In Lopez, the Ninth Court found that the plaintiff failed to raise a genuine issue of material

12   fact as to whether it would be clear to a reasonable doctor under the circumstances that a delay in

13   plaintiff's surgery would pose a substantial risk of harm.  As discussed above, defendants did not

14   address plaintiff's claim that defendant Horowitz acted with deliberate indifference when she

15   issued the February 11, 2015, and May 18, 2015 RFSs on a routine, rather than urgent, basis

16   despite having knowledge of plaintiff's family history of esophageal cancer.  For this reason, the

17   undersigned did not reach the issue of whether plaintiff met his summary judgment burden of

18   demonstrating a genuine issue of material fact as to whether it would be clear to a reasonable

19   doctor under the circumstances that delaying plaintiff's treatment by issuing routine RFSs would

20   pose a substantial risk of serious harm.  Accordingly, the undersigned finds that defendant

21   Horowitz is not entitled to qualified immunity pursuant to Lopez.

22   *Denial of Request for In-Cell Feeding Status and Wedge Pillow*

23   Based on the discussion above, the undersigned finds that taking the facts in the light most

24   favorable to plaintiff, the record demonstrates that defendant Horowitz violated plaintiff's Eighth

25   Amendment right to adequate medical care when she denied his request for permanent in-cell

26   feeding status on June 15, 2016, and when she denied plaintiff's grievance requesting four

27   pillows to elevate his head and neck.

28

1    It has long been established that a medical professional violates the Eighth Amendment by

2    intentionally denying or delaying medical care for a serious medical need.  See Estelle v. Gamble,

3    429 U.S. 97, 104-05 (1976).  Based on plaintiff's allegations that he had a serious medical need

4    requiring that he elevate his head and neck thirty degrees and that he eat six small meals per day,

5    it would be clear to a reasonable doctor that denying plaintiff's request for in-cell feeding status

6    and additional pillows to elevate his head and neck violated the Eighth Amendment.

7    Accordingly, defendant Horowitz is not entitled to qualified immunity as to these claims.

8    VIII.    Remaining Matters

9         A.   Plaintiff's Request for Injunctive Relief

10   As discussed above, plaintiff also seeks injunctive relief.  Plaintiff seeks a permanent wedge

11   pillow, in-cell feeding as long as necessary, a permanent lower bunk and an order prohibiting

12   defendants from housing him in an air-conditioned cell/dorm.  (ECF No. 9 at 23-24.)

13   Defendants do not move for summary judgment as to plaintiff's claims for injunctive

14   relief.  In his opposition, plaintiff alleges that he now has permanent in-cell feeding status.  (ECF

15   No. 64 at 9.)  Therefore, plaintiff's request for permanent in-cell feeding status may be moot.

16   In his opposition, plaintiff alleges that in October 2019, his request for additional blankets

17   to elevate his head to thirty degrees was denied.  Attached to the opposition is a form titled

18   "Reasonable Accommodation Chrono" denying this request.  (ECF No. 64 at 19.)  Therefore,

19   plaintiff's request for a wedge pillow or additional bedding to elevate his head and neck thirty

20   degrees may not be moot.

21   Defendant Horowitz cannot respond to plaintiff's claim for injunctive relief because she is

22   retired.  (ECF No. 60-5 at 1.)  Defendant Smith is still employed as the Chief Physician and

23   Surgeon at MCSP.  (ECF No. 60-6 at 1.)  Therefore, defendant Smith could respond to an order

24   for injunctive relief.

25   Accordingly, based on defendants' failure to address plaintiff's request for injunctive

26   relief, the undersigned finds that defendant Smith remains as a defendant in this action in his

27   official capacity.

28   ////

1          B.  Timeliness of Motion for Summary Judgment

2          In the opposition, plaintiff argues that defendants' summary judgement is untimely

3    because the court already ruled on a motion for summary judgment filed by defendants.

4    Defendants previously filed a motion for summary judgment on the grounds that plaintiff failed to

5    exhaust administrative remedies.  (ECF No. 38.)  The court granted in part and denied in part this

6    motion.  (ECF No. 57.)  Defendants' filing of the previous motion on the grounds that plaintiff

7    failed to exhaust administrative remedies did not preclude defendants from filing the pending

8    summary judgment motion addressing the merits of plaintiff's claims.  Accordingly, plaintiff's

9    objection that defendants' summary judgment motion is not timely is without merit.

10         C.  Plaintiff's Surreply

11         On April 6, 2020, plaintiff filed a surreply to defendants' reply.  (ECF No. 66.)

12   Defendants request that the surreply be stricken as improperly filed.  (ECF No. 67.)

13         Parties do not have the right to file surreplies and motions are deemed submitted when the

14   time to reply has expired.  Local Rule 230(l).  The court generally views motions for leave to file

15   a surreply with disfavor.  Hill v. England, 2005 WL 3031136, at *1 (E.D. Cal. 2005) (citing

16   Fedrick v. Mercedes–Benz USA, LLC, 366 F.Supp.2d 1190, 1197 (N.D. Ga. 2005)).  However,

17   district courts have the discretion to either permit or preclude a surreply.  See U.S. ex rel. Meyer

18   v. Horizon Health Corp., 565 F.3d 1195, 1203 (9th Cir. 2009) (district court did not abuse

19   discretion in refusing to permit "inequitable surreply"); Provenz v. Miller, 102 F.3d 1478, 1483

20   (9th Cir. 1996) (new evidence in reply may not be considered without giving the non-movant an

21   opportunity to respond).

22         The undersigned has reviewed plaintiff's surreply and finds that it contains primarily

23   evidence going to his request for injunctive relief.  The exhibits attached to the surreply largely

24   address plaintiff's more recent requests for extra bedding to elevate his head and neck.  Because

25   plaintiff's request for injunctive relief was not addressed in the summary judgment motion, the

26   undersigned grants defendants' motion to strike the surreply.

27         Accordingly, IT IS HEREBY ORDERED that defendants' request to strike plaintiff's

28   surreply is granted;

1       IT IS HEREBY RECOMMENDED that defendants' summary judgment motion (ECF

2   No. 60) be denied as to plaintiff's claims that defendant Horowitz violated his Eighth Amendment

3   rights by issuing the February 11, 2015, and May 18, 2015 chronos on a routine basis and by

4   denying plaintiff's request for in-cell feeding status on June 15, 2016, and his request for

5   additional pillows to elevate his head.  Defendants' summary judgment motion should be granted

6   in all other respects.

7       These findings and recommendations are submitted to the United States District Judge

8   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

9   after being served with these findings and recommendations, any party may file written

10  objections with the court and serve a copy on all parties.  Such a document should be captioned

11  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

12  objections shall be filed and served within fourteen days after service of the objections.  The

13  parties are advised that failure to file objections within the specified time may waive the right to

14  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

15  Dated:  June 3, 2020

16

17                                          _____
                                            KENDALL J. NEWMAN
18                                          UNITED STATES MAGISTRATE JUDGE

19  Ten1802.sj

20

21

22

23

24

25

26

27

28

30